UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                     :

    UNITED STATES OF AMERICA       :

                                       :

              - v. -              :               S6 20 Cr. 626 (PMH)

                                       :

    DWIGHT REID, et al.,           :

                                       :

              Defendants.         :

                                       :

                                       :
------------------------------------------------------- x

# THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Shiva H. Logarajah
David R. Felton
Courtney Heavey
Assistant United States Attorneys
     - *Of Counsel* -

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................... 1

**ARGUMENT** ...............................................................................................................1

I.    The Court Should Deny Defendant Erskine's Motion to Suppress Evidence .................1

    A.  The *Franks* Claims Should Be Summarily Dismissed................................................1

    B.  Judge Ramos Correctly Found That There Was Probable Cause to Tap the 8755 ....8

    C.  Judge Ramos's Determination That the Necessity Requirement Was Met Should Not Be Disturbed..................................................................................................11

    D.  The Defendant's Motion to Suppress Cell-Site Location Information Should Also Be Denied ...................................................................................................12

II.    Erskine's Chain of Custody Motion Is Meritless ........................................................13

III.    No Bill of Particulars Is Warranted...........................................................................15

    A.  Applicable Law ...............................................................................................15

    B.  Discussion ......................................................................................................17

IV.    Erskine Should Be Tried With His Co-Defendants .......................................................19

    A.  Applicable Law ...............................................................................................19

    B.  Discussion ......................................................................................................22

V.    Miscellaneous Disclosure Deadlines.........................................................................24

**CONCLUSION** ........................................................................................................25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in response to the pretrial motions filed by the remaining[1] defendants in this case.  (Dkt. Nos. 385, 386, 389, 395).  The defendants seek the following relief: (1) to suppress certain wiretap and location evidence; (2) a hearing regarding the chain of custody of wiretap evidence; (3) Erskine seeks a bill of particulars; (4) Erskine and Walker move for severance from their co-defendants; and (5) that the Court set certain disclosure deadlines.  For the reasons set forth below, the defendants' motions are meritless and should be denied without an evidentiary hearing, with the exception that the Government agrees to provide Rule 404(b) evidence 60 days before trial.

## I.    The Court Should Deny Defendant Erskine's Motion to Suppress Evidence

Erskine, on behalf of his co-defendants,[2] attempts to suppress a wiretap on a phone he used ending in -8755 (the "8755 Number") which was authorized by Judge Edgardo Ramos after reviewing, in part, an affidavit prepared by Federal Bureau of Investigation ("FBI") Task Force Officer ("TFO") Joseph McGann (the "8755 Affidavit").[3]  He advances three primary arguments: (1)  deliberate falsehoods and omissions in the 8755 Affidavit require suppression; (2) the 8755 Affidavit lacks probable cause; and (3) the necessity requirement, set forth in 18 U.S.C. § 2518(3)(c), has not been met.  He also moves to suppress certain location evidence.  The claims are meritless and should be denied without a hearing.

### A.    The *Franks* Claims Should Be Summarily Dismissed

#### 1.    Applicable Law[4]

##### (a)   The Defendants Must Advance Allegations That, if Proven, Entitle

---

[1] Defendants DeShawn Thomas and Caswell Senior withdrew their motions in connection with their guilty pleas.  (*See* Dkt. Nos. 416 & 417).

[2] Reid, Soto, and Walker joined the motion without advancing additional arguments, though at times Walker refers to the wiretap of his own phone (not Erskine's) and Soto refers to the wiretap of Naya Austin's phone (not Erskine's).  (Dkt. Nos. 385, 385-1, 389 & 395).  These motions all fail for the reasons offered in opposition to Erskine's motion.

[3] The 8755 Affidavit also attached affidavits in support of wiretap applications of phones used by co-defendants Naya Austin and Ahmed Walker.

[4] Unless otherwise noted, quotations from cases cited in this brief omit internal quotation marks, citations, and alterations.

**Them to Relief**

There is a "presumption of validity with respect" to a wiretap affidavit. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).[5] "A challenge to the veracity of such an affidavit will succeed only when it establishes intentional or reckless omissions or false statements that are necessary to the finding of probable cause supporting the wiretap authorization." *United States v. Miller*, 116 F.3d 641, 664 (2d Cir. 1997).

These circumstances are quite limited. *Cf. Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) ("The *Franks* standard is a high one."). "Every statement in a warrant affidavit does not have to be true" for the warrant to be valid. *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997). And so "[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000). A "substantial preliminary showing" on both elements—intent and materiality—is necessary to warrant even an initial hearing on the defendant's claim. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008); *see also Franks*, 438 U.S. at 170 ("The requirement of a substantial preliminary showing . . . prevent[s] the misuse of a veracity hearing for purposes of discovery or obstruction."). And if a hearing is ordered, the defendant ultimately bears the burden of proving intent and materiality by a preponderance of the evidence. *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008).

**(b)  Intent**

The *Franks* standard is designed to prevent "lawless or reckless misconduct." 438 U.S. at 169. As a result, "[a]llegations of negligence or innocent mistake are insufficient." *Id.* Instead, courts examine the "actual state[] of mind of the [affiant]" to determine whether the affiant made

---

[5] While *Franks* dealt with a search warrant affidavit, the Second Circuit has consistently upheld the use of its analytical framework to determine whether "alleged misstatements and omissions in . . . wiretap application[s] require[] suppression." *United States v. Rajaratnam*, 719 F.3d 139, 151 (2d Cir. 2013).

misrepresentations that were (1) "designed to mislead" or (2) "made in reckless disregard of whether [they] would mislead." *United States v. Rajaratnam* 719 F.3d 139, 153–54 (2d Cir. 2013).

### (c) Materiality

Materiality requires a showing that the "false information was necessary to the issuing judge's probable cause determination." *Canfield*, 212 F.3d at 718. "To determine if misrepresentations . . . are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718.

"Probable cause is not a high bar." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). In other words, probable cause exists where the "the facts available . . . would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013). In assessing whether this "practical and common-sensical standard" is met, courts "have consistently looked to the totality of the circumstances." *Id.*

### 2. Discussion

Erskine fails to make a "substantial preliminary showing," *Falso*, 544 F.3d at 125, that there is a material misstatement or omission in the 8755 Wire Affidavit, much less one that is a result of a "deliberate falsehood or reckless disregard for the truth," *Canfield*, 212 F.3d at 718.

### (a) Mere Disagreement With TFO McGann's Interpretations Cannot Be the Basis for a *Franks* Hearing

To start, much of what Erskine labels as material misstatements are, in fact, McGann's reasonable interpretations of coded conversations. Erskine's "dispute with [McGann's] interpretations of conversations does not warrant either a *Franks* hearing or suppression." *United States v. Gotti*, 42 F. Supp. 2d 252, 280 (S.D.N.Y. 1999); *United States v. Jimenez*, 824 F. Supp. 351, 361 (S.D.N.Y. 1993) (holding a "counter-interpretation of acts . . . does not satisfy the

showing required for a *Franks* hearing.").[6]  Put differently, Erskine seeks to "have the presumption of validity" be "overcome by [his] self-interested inferences and conclusory statements." *United States v. Souffront*, 338 F.3d 809, 823 (7th Cir. 2003).

The Court should reject that invitation.  This is especially so when examining the interpretations at issue.  To start, Erskine finds McGann's view of coded lingo—"8balls" and "grams"—used by a co-conspirator when discussing Erskine's role as a supplier as references to narcotics to be "preposterous" and "ridiculous."  (Dkt. No. 386-12 at 9).  But, even the Second Circuit has found, without controversy, that "[a]n eight-ball contains one-eighth of an ounce, or three and one-half grams of cocaine"—which, as Erskine concedes, is exactly how McGann interpreted that term in the 8755 Wire Affidavit.  *United States v. Wozniak*, 126 F.3d 105, 108 (2d Cir. 1997); *see also United States v. Snow,* 462 F.3d 55, 59 (2d Cir. 2006) (discussing purchases of "eight-ball[s] of cocaine").  McGann's interpretation of "grams" to refer to crack cocaine—a drug which requires a labor intensive "cooking" process to prepare, *see United States v. Townsend*, 2007 WL 2936308, at *2 (S.D.N.Y. Oct. 4, 2007) (describing preparation of crack cocaine)—is similarly reasonable given the co-conspirator's understanding that Erskine would not sell unless a certain minimum order ("50") was put in.  And Erskine does not even "offer another interpretation" of

---

[6] Courts around the country have adopted this common-sense position.  *See, e.g.*, *United States v. Lopez,* 2021 WL 4745993, at *5 (D. Or. Oct. 12, 2021) (rejecting defendant's request for *Franks* hearing where there was no "convincing evidence that [the] Special Agent . . . intentionally attempted to mislead the magistrate judge with any of the interpretations"); *United States v. Maike*, 2020 WL 1955264, at *6 (W.D. Ky. Apr. 23, 2020) (rejecting, as a basis for a *Franks* hearing, defendant's effort to "argu[e] that a different interpretation should be placed on his conduct tha[n] the [Agent's] interpretation"); *United States v. Bercoon*, 2016 WL 11717711, at *18 (N.D. Ga. Aug. 31, 2016), *report and recommendation adopted*, 2017 WL 3167805 (N.D. Ga. July 25, 2017), *aff'd sub. nom. United States v. Goldstein*, 989 F.3d 1178 (11th Cir. 2021); *United States v. Glover*, 583 F. Supp. 2d 21, 34–35 (D.D.C. 2008) (rejecting defendant's counter interpretation as a basis for a *Franks* hearing where the defendant "offered no affidavits or other corroborative proof to show that [the] Special Agent lacked conviction about his own interpretations of the events and coded conversations"); *United States v. Thomas*, 2006 WL 3694613, at *3 (E.D. Mich. Dec. 14, 2006).

those text messages and "has offered nothing but conclusory allegations in support of his disagreement"—a far cry from what is required by *Franks*. *Bercoon*, 2016 WL 11717711, at *18.

Erskine also quibbles with McGann's interpretation of two jail calls he had with Habbakuk Tracey (the "Tracey Calls")—an individual, as McGann noted in his affidavit, who was arrested and convicted after drugs and a firearm were found in the very residence where Erskine was residing.  (See Dkt. No. 386-2 at 22 n.11).  After laying out that fact, alongside evidence that Erskine's co-conspirators viewed him as a supplier, McGann provided a transcript of pertinent parts of two jail calls between Erskine, using the 8755 Number, and Tracey.  In the first call, Erskine referred to an "arrangement" he has with Tracey—over which Erskine had "full control"—while staying in Tracey's residence.  *See id.* at 22.  And in the second, Erskine and Tracey discussed an arrangement between Erskine and another individual who seemingly did not hold up his end of the bargain.  *See id.* at 23.  Erskine became uncomfortable talking about the subject matter on a recorded prison line during that conversation.  *Id.*

McGann, after beginning the 8755 Affidavit by describing his training and experience in narcotics investigations, then interpreted the Tracey Calls as relating to narcotics.  *See id.* at 23-24; *cf. United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) ("[T]he powers of observation of an officer with superior training and experience should not be disregarded.").  Erskine offers his own interpretations of the calls and finds that there is "no indication" that they are about narcotics.  (Dkt. No. 386-12 at 14).  But "drug dealers seldom negotiate the terms of their transactions with the same clarity as business persons engaged in legitimate transaction"; instead, they rely on "code." *United States v. Garcia*, 291 F.3d 127, 139 (2d Cir. 2002).  In any case, mere "differences over" McGann's reasonable interpretations of the coded Tracey Calls fall far short from establishing that McGann deliberately misled Judge Ramos.  *Gotti*, 42 F. Supp. 2d at 280-81; *see also United States v. Symmank*, 397 F. App'x 991, 994 (5th Cir. 2010) (holding that "interpreting and describing" evidence that was "described differently by [agent] does not satisfy defendant's burden of presenting a challenge that is more than conclusory" under *Franks*).

5

**(b)   TFO McGann's Description of the August 10 Transaction Does Not Give Rise to a *Franks* Claim**

Erskine next claims there were misstatements or omissions in how McGann described an August 10 narcotics transaction in the 8755 Affidavit.  His arguments, however, are largely based on faulty or mistaken premises, as described below.

First, Erskine claims the McGann intentionally omitted discussion of an earlier meeting the confidential informant ("CI") had with co-conspirators on August 10.  Erskine claims that a recording of this meeting "has not been produced." (Dkt. No. 386-12 at 12).  That is not true.  The Government has turned that recording over.[7]  Much of the mystery Erskine alleges from that day is cleared up by listening to that recording.  On it, the CI can be heard rejecting the "narcotics" Erskine's co-conspirators tried to sell him earlier on August 10.  This rejection by the CI thus precipitates the need for Erskine's co-conspirators to take the trip from Peekskill to Brooklyn to meet with Erskine in the afternoon of August 10.

This earlier meeting with the CI was not included in McGann's affidavit.  But "an affidavit" does not include "every piece of information gathered." *United States v. Awadallah*, 349 F.3d 42, 67 (2d Cir. 2003).  And so "*Franks* protects against omissions that are designed to mislead, or . . . are made in reckless disregard of whether they would mislead." *Id.*  The omission of the earlier meeting with the CI on August 10 falls far short of that standard.  In fact, it is *inculpatory*.  That is, if McGann had described the earlier meeting with the CI in the 8755 Affidavit, it would have reinforced the affidavit because it would have shown the ready access Erskine had to narcotics because members of the conspiracy turned to Erskine when they needed drugs quickly.  The Second Circuit has made clear that these omissions—facts which would have "*strengthened*" the affidavit—are far afield from those *Franks* seeks to protect against. *United States v. Thomas*, 788 F.3d 345, 351 (2d Cir. 2015); *see also Rajaratnam*, 719 F.3d at 155 ("[W]e cannot conclude that the government omitted certain information about the SEC investigation with 'reckless

---

[7] The bates stamp for this recording is USAO_388185.

disregard for the truth' when it is clear that fully disclosing the details of that investigation would only have strengthened the wiretap application's 'necessity' showing.").

Much the same can be said about the second issue Erskine raises on this front. Erskine claims that the "[A]ffiant cannot corroborate these events with calls and/or texts messages between Austin and Erskine's phone . . . during this time" because there were not calls or texts made between them on this day. Again, that is not true. As reflected on Austin's wire, Erskine, on the 8755 Number, and Austin had a call at approximately 5:51 p.m. that day. During the call, Austin tells Erskine to "come back to the block," implying that Erskine had met with Austin or her associates earlier that day.[8] And, again, the inculpatory nature of this contact demonstrates that it comes nowhere near the character of omission *Franks* is designed to protect against. *See Thomas*, 788 F.3d at 751.

Third, Erskine claims that "there is no indication that any law [enforcement] officer surveilled [Austin's] associates' drive from Brooklyn back to Peekskill." (Dkt. No. 386-12 at 12). Again, that is not true. In a surveillance log from that day, Detective John Marchioni of the Peekskill Police Department noted that a vehicle with Austin's associates "proceed[ed] west" after leaving Erskine's residence and "continue[d] back to Peekskill."[9] *See* Ex. A at 2. The only way Marchioni would know that is if he followed the vehicle back to Peekskill. In fact, he noted the exact time the car arrived at the location for a controlled buy in Peekskill. *Id.* The common-sense interpretation is that Marchioni followed them back to Peekskill from Brooklyn. More importantly: that is what Marchioni relayed to McGann and the basis for McGann's statement in

---

[8] A draft transcription of this call was produced to the defendant as USAO_004060. In addition, at trial, the Government would introduce evidence from an extraction of Austin's cellphone—obtained after Judge Ramos approved the 8755 Wire and produced to the defendant as USAO_387930—that the defendant, using a different number, and Austin were also communicating via the encrypted WhatsApp application on August 10.

[9] This was produced to the defendant as USAO_393955.

the 8755 Affidavit that Austin's associates traveled "back to Peekskill—making no stops."[10]  There was no misstatement on this score by McGann.

Fourth, and finally, Erskine seizes on Marchioni's careful description in the surveillance log that he saw an individual who "appeared to be" Erskine.  *Id.*  McGann reported in the 8755 Affidavit that law enforcement had surveilled Erskine during the August 10 Transaction.  If Erskine is now arguing that McGann should have included the degree of certainty with which Marchioni identified Erskine in the 8755 Affidavit, he "has failed to demonstrate that the [omission] was . . . anything more than negligence or [an] innocent mistake."  *United States v. Dan Zhong*, 2018 WL 6176023, at *5 (E.D.N.Y. Nov. 26, 2018) (finding that agents did not deliberately mislead court when affidavit said they communicated with defendant in English when they had communicated with defendant using a translator).  In short, Erskine's hairsplitting is far from evidence of "deliberate prevarication."  *United States v. Millar*, 79 F.3d 338, 343 (2d Cir. 1996) (rejecting similar claim where affidavit said that a car had been purchased with cash only, when in fact it was purchased "with a combination of cash, cashier's checks, and a $500 personal check").

## B.  **Judge Ramos Correctly Found That There Was Probable Cause to Tap the 8755 Number**

### 1.  **Applicable Law**

Before authorizing a wiretap, an issuing court must find probable cause that: (i) an individual is committing, has committed, or is about to commit an enumerated offense; (ii) particular communications concerning that offense will be obtained through the requested interception; and (iii) the facilities subject to interception are being used in connection with the offense.  18 U.S.C. § 2518(3); *see also United States v. Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008).

"Probable cause is not a particularly demanding standard."  *United States v. Scala*, 388 F. Supp. 2d 396, 401 (S.D.N.Y. 2005).  "Probable cause to issue a wiretap order exists when the facts

---

[10] The Government has confirmed this with Marchioni and expects that he will testify to that at trial.  Additionally, the defendant takes issue with the amount of time it took for Austin's associates to travel from Brooklyn to Peekskill on August 10. Def's Motion at 12.  The Government expects that Marchioni will testify, consistent with the experience of many who have driven in New York City, that there was traffic throughout the early evening drive back to Westchester County.

made known to the issuing court are sufficient to warrant a prudent man in believing that evidence of a crime could be obtained through the use of electronic surveillance." *United States v. Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd sub nom. United States v. Aulicino*, 44 F.3d 1102 (2d Cir. 1995). "In assessing probable cause, an affidavit submitted to support a wiretap application must be read as a whole, and construed in a realistic and common-sense manner.  In other words, a court must look at the snowball, not the individual snowflakes." *United States v. Stern*, 2017 WL 1476149, at *3 (S.D.N.Y. Apr. 22, 2017).

"[W]iretap orders are presumed valid." *United States v. Zapata*, 164 F.3d 620 (2d Cir. 1998); *see also United States v. Dawkins*, 2019 WL 2464924, at *3 (S.D.N.Y. May 23, 2019) (same). "[A] defendant seeking to suppress an authorized wiretap bears a significant burden." *United States v. Sang Bin Lee*, 2014 WL 144642, at *3 (S.D.N.Y. Jan. 15, 2014). "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists" and the "reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993).

### 2.  There Was Ample Probable Cause in the 8755 Wire Affidavit

McGann's affidavit listed three categories of offenses for which there was probable cause: (1) racketeering offenses, in violation of 18 U.S.C. §§ 1962(c), (d), and 1963; (2) narcotics offenses, in violation of 21 U.S.C. §§841, 846, 853(p); and (3) wire fraud, in violation of 18 U.S.C. § 1343.  Erskine asserts that the affidavit failed to set forth probable cause as to each.

There was ample probable cause for each of these offenses before Judge Ramos.  Erskine asserts that his "ties to Gorilla Stone do not support probable cause that a crime was committed." (Dkt. No. 386-12 at 15).  This is wrong. As noted in the affidavit, Erskine used the 8755 Phone to:

- Manage a gang-related meeting attended by co-defendants Austin and Walker (*see* Dkt. No. 386-2 at 16-17);
- Have a detailed discussion with gang leader Austin about whether to spend communal funds for a gang member who had committed a shooting at the behest of another gang leader, *see id.* at 17-19;
- Discuss acts of violence with gang founder and leader, Dwight Reid, *see id.* at 20; and

9

- Discuss narcotics trafficking and fraud, as further discussed below.

Even assuming the affidavit did not tie Erskine to a predicate racketeering act—which the Government is not conceding—Erskine does not dispute that the 8755 Affidavit (and the accompanying affidavits for phones used by Austin and Walker) shows that (1) other gang members were committing crimes, including acts of violence, which he was aware of, and (2) other gang members—who he oversaw—trafficked narcotics. *Cf. United States v. Daidone*, 471 F.3d 371, 374 (2d Cir. 2006) ("Under the RICO statute, a pattern of racketeering activity requires at least two acts of racketeering activity . . . .").

At a bare minimum, then, Erskine does not contest that Judge Ramos was left with ample proof that Erskine was using the 8755 Number to manage Gorilla Stone's "enterprise." *See, e.g.*, *United States v. White*, 7 F.4th 90, 100 (2d Cir. 2021) (evidence of "leaders, members, and practices," including "disseminating information about the gang's activities[,]" was proper enterprise evidence in a RICO prosecution); *United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) ("[E]vidence of the defendants' agreement to form an enterprise and participate in its affairs included . . .paying bail and attorney's fees when a member was criminally charged"); *see also Boyle v. United States*, 556 U.S. 938, 946 (2009) (holding that an "association-in-fact enterprise" under RICO requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose"). Put another way, Judge Ramos had "facts" before him which would make "the discovery of evidence" about Gorilla Stone's enterprise "thereof probable." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

But more than that: there was overwhelming probable cause that Erskine himself had used the 8755 Number to engage in narcotics trafficking and wire fraud, both of which are predicate racketeering acts. As discussed above, the 8755 Affidavit laid out several facts that Erskine was engaged in narcotics trafficking, including:

- Erskine's co-conspirators viewed him as a supplier of narcotics (*see* Dkt. No. 386-2 at 21);
- Erskine engaged in a narcotics transaction with other members of Gorilla Stone (*see id.* at 20-21;

- Erskine used the 8755 Number to discuss narcotics activity with an incarcerated individual who previously resided at Erskine's residence and was arrested with narcotics (*see id.* at 22-24; and
- Erskine was in close and frequent contact with other members of Gorilla Stone who sold narcotics (*see id.* at 26-29; *cf. United States v. Todisco*, 667 F.2d 255, 258 (2d Cir. 1981) (holding that "numerous calls to other known narcotics dealers" supported a finding of probable cause for a wiretap).

Moreover, the 8755 Affidavit sufficiently demonstrated that Erskine was engaged in wire fraud with the use of a purported 501(c)(3), D.A. E.M.P.I.R.E. Erskine points to the purported charitable nature of D.A. E.M.P.I.R.E. as a reason why he was not engaged in wire fraud. That, however, is part of the fraud. As laid out in the 8755 Wire Affidavit, Erskine explained to Reid on a recorded prison call that the true purpose of D.A. E.M.P.I.R.E. was the self-enrichment of gang members, not charity. (*See* Dkt. No. 386-2 at 24-25).

In short, these facts were more than sufficient for Judge Ramos to find probable cause that Erskine was using the 8755 Number to further his participation in a racketeering and narcotics trafficking conspiracy and wire fraud scheme. *Cf. United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005) (describing probable cause as a "relaxed standard" based on a "commonsense test").

### C. Judge Ramos's Determination That the Necessity Requirement Was Met Should Not Be Disturbed

Before authorizing a wiretap under Title III, a judicial officer must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Thus, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This requirement ensures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

However, this "alternative means" requirement is not "an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult." *See, e.g., United States v. Labate*, 2001 WL 533714, at *13 (S.D.N.Y. May 18, 2001).

Title III also does not establish a "requirement that any particular investigative procedure be exhausted before a wiretap may be authorized." *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987). Moreover, "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009). So, while "generalized and conclusory statements that the other investigative procedures would prove unsuccessful" are not sufficient, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Id.* Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Id.* Courts, therefore, must take a "commonsense approach" to the necessity requirement. *Id.*

Here, Erskine faults the Government for failing to conduct more surveillance and for not attempting to use more CIs. But, as McGann explained, both of those techniques would not allow law enforcement to fully "piece together the entirety of a complex, criminal organization, like Gorilla Stone." Indeed, because of this, as Judge Furman has observed, "the Court of Appeals and courts in this Circuit have repeatedly approved of wiretaps in complex and sprawling criminal cases involving large conspiracies." *Sang Bin Lee*, 2014 WL 144642, at *2. Here, McGann detailed 14 different investigative techniques and "provid[ed] a basis for the issuing judicial officer to conclude that the nature of the current case is" similar to ones where wiretaps are routinely approved and "less intrusive investigative procedures would [not] have been feasible." *Dawkins*, 2019 WL 2464924, at *4. This Court should not disturb Judge Ramos's necessity conclusion.

### D. **The Defendant's Motion to Suppress Cell-Site Location Information Should Also Be Denied**

Erskine also argues that a warrant for prospective cell-site location information should be suppressed for reasons similar to his argument that the 8755 Affidavit lacked probable cause with respect to any racketeering violation. For the reasons stated in Section I.B.2, *supra*, the Court should reject that challenge. Moreover, Erskine has not established standing to challenge that warrant. It is axiomatic that "the proponent of a motion to suppress has the burden of establishing

that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). The law is clear that the burden on the defendant to establish [Fourth Amendment] standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge." *United States v. Montoya-Escchevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995). This standing requirement applies to searches of cell-site data—where the defendant must establish ownership or another possessory interest in the phone at the time for which the data is searched—as it does to searches of physical spaces. *See*, *e.g.*, *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014). Here, the defendant has submitted no affidavit or evidence establishing standing to challenge. Hence, his motion should be denied for the independent reason that he has failed to make this threshold showing. And regardless, as noted above, his motion is meritless.

## II.   **Erskine's Chain of Custody Motion Is Meritless**

Erskine, joined by Walker, asks for an evidentiary hearing based on speculation that the wire recordings could have been altered or tampered within the less than 24 hours that the recordings were unsealed and then resealed pursuant to Court orders. (Dkt. No. 386-12 at 20). This motion should be denied because Erskine's chain of custody arguments go to the weight, not admissibility of the evidence, which Erskine can attempt to raise at trial.

Federal Rule of Evidence 901(a) states: "To satisfy the requirement of authenticating . . . the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The Second Circuit has described the requirements of Rule 901(a) as "not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). "The proponent need not rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be." *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014). Rule 901 is satisfied where "sufficient proof has been introduced so that a reasonable jury could find in favor of authenticity or identification." *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004). Applying these principles, courts have repeatedly found that the Rule 901 authentication requirements can be satisfied by: (1) witnesses who have information

13

about how the evidence was recorded and collected, *see, e.g.*, *United States v. Whittingham*, 346 F. App'x 683, 685 (2d Cir. 2009); (2) witnesses who accessed and retrieved the recordings, *see, e.g.*, *United States v. Oreckinto*, 234 F. Supp. 3d 360, 366 (D. Conn. 2017); *United States v. Edington*, 526 F. App'x 584, 591 (6th Cir. 2013); or (3) witnesses who testified that the images and videos fairly and accurately depicted events they personally observed, *see, e.g.*, *Louis Vuitton, S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973-74 (2d Cir. 1985); *King v. Wang*, 2021 WL 5232454, at *10 (S.D.N.Y. Nov. 9, 2021).

Pursuant to 18 U.S.C. § 2518(8)(a), "[i]mediately upon the expiration of the period of the order, or extensions thereof [wiretap] recordings shall be made available to the judge issuing such order and sealed under his directions." And the "presence of the seal . . . or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire." *Id.*

In this case, the wiretap recordings were authorized on September 4, 2020, by order of Judge Ramos. It is undisputed that they were timely sealed on October 5, 2020, by order of Judge Kenneth M. Karas. Thereafter, on December 21, 2020, Judge Karas ordered that the recordings could be unsealed for the limited purpose of allowing the FBI to make an additional copy. Ex. B. This limited unsealing took place on December 29, 2020, and after making a copy, the recordings were re-sealed on the same day by order of Judge Cathy Seibel. *See* Exs. C and D at 6.

The Government will authenticate this wire at trial through testimony of law enforcement officers with knowledge of how the recordings were obtained and maintained. Defense counsel's pure speculation, without offering any factual support, that the recordings could have been altered in the short period that they were unsealed based on a court order is baseless. Indeed, taking Erskine's argument to its logical extension, a defendant would be entitled to an evidentiary hearing on the chain of custody of *any* piece of evidence any time his or her attorney speculates that the evidence could have been tampered with in some way. But that is obviously not the law. Moreover, any such argument is to be addressed at trial because arguments about chain of custody

14

or the evidence's susceptibility to tampering goes to the weight, not the admissibility, of the evidence. *See United States v. Sovie*, 122 F.3d 122, 127 (2d Cir. 1997) ("allegations of tampering went to weight of the evidence rather than to its admissibility"); *United States v. Ida*, 1997 WL 122753, *3 (S.D.N.Y. Mar. 18, 1997) ("The tapes are not inadmissible merely because one can conjure up hypothetical possibilities that tampering occurred."); *see also United States v. Grant*, 967 F.2d 81, 83 (2d Cir. 1992); *United States v. Bout*, 651 F. App'x 62, 64 (2d Cir. 2016) (explaining that a chain of custody "need not be free of defects" and alleged breaks in the chain of custody "typically do not bear upon the admissibility of evidence, only the weight").

### III.   No Bill of Particulars Is Warranted

Erskine seeks a bill of particulars regarding the racketeering conspiracy's wire fraud allegations and the narcotics conspiracy charged in Counts One and Sixteen of the S6 Superseding Indictment (the "Indictment"). (Dkt. No. 386-12 at 21-22). The Court should reject this request; Erskine's motion is procedurally barred under the local rules and also fails on the merits.

#### A.  Applicable Law

Under Local Criminal Rule 16.1, "[n]o motion addressed to a bill of particulars . . . shall be heard unless counsel for the moving party files in or simultaneously with the moving papers an affidavit certifying that counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised in the motion without the intervention of the Court and has been unable to reach agreement." Failure to comply, "[b]y itself, . . . is fatal to the motion." *United States v. Dupigny*, 2019 WL 2327697, at *2 (S.D.N.Y. May 30, 2019).

The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. *See* Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (abrogated on other grounds by *United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). The ultimate test is whether the information sought is *necessary*, not whether it is helpful. *See United States v. Conley*, 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002); *United States v.*

15

*Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001).

"Acquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234; *see also United States v. Skelos*, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015). The defense cannot use a bill of particulars as a general investigative tool, *see United States v. Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973); *United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995) (Parker, *J.*), or as a device to compel disclosure of the Government's evidence prior to trial, *United States v. Triana-Mateus*, 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002). Nor should a bill of particulars be weaponized to "lock the government into its proof." *United States v. Rigas*, 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003).   In the context of conspiracy allegations, "the defendant does not need detailed evidence about the conspiracy in order to prepare for trial properly." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).  Conspiracy defendants such as Erskine simply are "not entitled to a bill of particulars setting forth the whens, wheres, and with whoms regarding" the enterprise and conspiracy. *United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996).   Accordingly, the Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *see Muyet*, 945 F. Supp. at 598-99.  Moreover, the Government's provision of particulars that are tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also Sindone*, 2002 WL 48604, at *1.

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required.  *Bortnovsky*, 820 F.2d at 574; *see, e.g.*, *United States v. Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012) (noting the "enormous amount of discovery material," including "search warrant affidavits" which "lay out the Government's investigation in detail" and "provide [the defendant] with much of the information

sought in the request for a bill of particulars"); *United States v. Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying request for bill of particulars where indictment and discovery materials, including search warrant affidavits, supplied information).

### B.  Discussion

Erskine and his co-defendants are not entitled to a bill of particulars.  As a threshold matter, the motion is "procedurally barred" for failure to comply with Local Criminal Rule 16.1.  *United States v. Goode*, 2018 WL 919928, at *15 (S.D.N.Y. Feb. 15, 2018).  That Rule requires the movant to confer with opposing counsel and file, simultaneously with the moving papers, an affidavit certifying that counsel has so conferred.  That has not happened; the motions deadline has come and gone and moving counsel never conferred with the Government or filed the required affidavit.  Counsel does not and cannot claim to have complied with this requirement.  As Judge Furman has explained, this failure, "[b]y itself, . . . is fatal to the motion."  *Dupigny*, 2019 WL 2327697, at *2; *see also United States v. Felton*, No. 17 CR. 21 (WHP), Dkt. No. 311 at 3 (same); *United States v. Arreaga*, 2005 WL 1253866, at *2 (S.D.N.Y. May 27, 2005) (failure "provides a sufficient basis to deny" motion); *United States v. Ojeikere*, 299 F. Supp. 2d 254, 260 (S.D.N.Y. 2004) (same); *United States v. Morales*, 280 F. Supp. 2d 262, 273 (S.D.N.Y. 2003) (same).

Even if counsel had complied with the Rule, the motion fails on the merits.  The Indictment plainly alerts Erskine and his co-defendants of the charges against them and provides information about the approximate dates of the charged conspiracies and the types and quantities of drugs involved.  As for Count One's wire fraud conspiracy allegations, the Indictment alleges that the defendants "committed, and conspired to commit, wire fraud by fraudulently obtaining benefits from relief programs meant to assist small businesses in response to the COVID-19 pandemic, fraudulently obtaining unemployment benefits, and conspiring to fraudulently use funds related to a section 501(c)(3) charitable organization operated by" the defendants.  (Ind. ¶ 7.g.).

Further, the Government has supplied the defendants with ample discovery relating to the above charges and spelled out information about the charged conspiracies—in painstaking detail—in six Title III wiretap affidavits (two of which were for Erskine's cellphone); dozens of social

media, premises (including Erskine's residence), and cellphone extraction warrants (including for four Erskine cellphones); and public filings and arguments, including in the Government's lengthy detention memo and arguments made in opposition to Erskine's and his co-defendants' bail applications, and in its sentencing submissions for various co-defendants.  For example, in an Erskine cellphone wiretap affidavit, the Government provided significant detail about Erskine's (and the gang's) narcotics trafficking and wire fraud conspiracies.  (*See* Dkt. No. 386-2 at 15-26). In this single document alone, the Government spelled out ways Erskine used his cellphone to manage the gang's affairs, traffic narcotics, and engage in wire fraud schemes to benefit the gang. With respect to narcotics trafficking, Erskine supplied crack cocaine to a gang member in Brooklyn on August 10, 2020, gang members discussed Erskine's role as a cocaine supplier to the gang, and Erskine himself discussed narcotics trafficking on his cellphone.  (*See id.* at 20-24).

As for the wire fraud, Erskine installed gang members as directors of the D.A. E.M.P.I.R.E. 501(c)(3) (*id.* at 24-26) and told gang leader Reid that they (and not the community) would personally profit from the non-profit: "Your wife, me, everybody else, we need to get paid the correct amount of bread and the only way we going to do that is through donations and grants. And then your wife, she don't have to worry about working and none of that. You ain't got to worry about shit like that no more," (Dkt. No. 51 at 16, 328 at 4-5).  As another example, in the sentencing submission for defendant Shanay Outlaw, the Government discussed various gang frauds relating to the 501(c)(3) and fraudulently obtaining unemployment benefits.  (Dkt. No. 328 at 2-5).  Additionally, the Government has had several discussions with counsel to various Erskine co-defendants to help them sift through discovery and remains willing to do so.  Given these detailed disclosures and the foregoing, Erskine's threadbare complaints about receiving insufficient information about his charges should be rejected.  Indeed, the Government has already provided far more evidence than the minimal information required.

In sum, the fishing expedition Erskine seeks is squarely foreclosed by case law and constitutes an attempt to disrupt the structured discovery system set forth in Federal Rule of

Criminal Procedure 16 and 18 U.S.C. § 3500. *See Torres*, 901 F.2d at 233-34; *United States v. Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied."). Through the lengthy, detailed Indictment, the ample discovery (including numerous wiretap and search warrant affidavits), and public filings and arguments, the Government has "identif[ied] with sufficient particularity the nature of the charge pending . . . thereby enabling the defendant[s] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574; *see also United States v. Lobo*, 2017 WL 1102660, at *2 (S.D.N.Y. Mar. 22. 2017); *United States v. Parris*, 2014 WL 2745332, at *5 (S.D.N.Y. June 17, 2014). Accordingly, the motion for a bill of particulars should be denied.

## IV.    **Erskine Should Be Tried With His Co-Defendants**

Erskine, joined by Walker, baldly asserts that his trial must be severed from that of his co-defendants because of "the possible burden of guilty by association" and his unsupported claim that certain violent co-defendants "likely have a tenuous connection" to him. (Dkt. No. 386-12 at 22-23). Erskine's generalized claims of prejudicial spillover are completely speculative, unsupported by the record, and fail to meet the "extremely difficult burden," *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989), of showing that a joint trial is inappropriate, given the strong presumption favoring joinder of defendants charged with a single conspiracy.

### A.    **Applicable Law**

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

> (a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or

> transactions, constituting an offense or offenses.  The defendants
> may be charged in one or more counts together or separately.  All
> defendants need not be charged in each count.

Rule 14 of the Federal Rules permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.

"There is a preference . . . for joint trials of defendants who are indicted together." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997).  "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *Salameh*, 152 F.3d at 115; *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991).  This preference reflects a settled precept in criminal law: "Joint trials play a vital role in the criminal justice system, as they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts . . . ." *United States v. O'Connor*, 650 F.3d 839, 858 (2d Cir. 2011).  Joint trials also "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury." *United States v. Barret*, 824 F. Supp. 2d 419, 432 (E.D.N.Y. 2011); *see also United States v. Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (a joint trial "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials").  As the Supreme Court has explained:

> Many joint trials—for example, those involving large conspiracies
> to import and distribute illegal drugs—involve a dozen or more co-
> defendants. . . .  It would impair both the efficiency and the fairness
> of the criminal justice system to require . . . that prosecutors bring
> separate proceedings, presenting the same evidence again and again,
> requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand.  Joint trials generally serve the
> interests of justice by avoiding inconsistent verdicts and enabling
> more accurate assessment of relative culpability—advantages which
> sometimes operate to the defendant's benefit.  Even apart from these
> tactical considerations, joint trials generally serve the interests of
> justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

Simply put, there is a strong and well-settled presumption that defendants who are indicted together will be tried together.  *See*, *e.g.*, *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  "A defendant raising a claim of prejudicial spillover bears an extremely heavy burden." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988).  That is, a defendant is "not entitled to severance [under Rule 14] merely because [he] may have a better chance of acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540.  Nor is a defendant entitled to severance just because the evidence against his co-defendants is more damaging or voluminous than the evidence against him.  *See*, *e.g.*, *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).  Indeed, "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993).  And even if a particular defendant is somehow prejudiced by joinder, that prejudice must be "sufficiently severe [as] to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986).  Thus, under the Supreme Court's decision in *Zafiro*, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  506 U.S. at 539.

In conspiracy cases, the Court's evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Salameh*, 152 F.3d at 111.  For this reason, the mere fact that evidence may be admitted concerning more extensive drug dealing or specific acts of violence committed by joined defendants is far from sufficient to warrant severance.  In fact, claims of prejudicial spillover "seldom succeed" in conspiracy cases.  *See United States v. Gambino*, 784 F. Supp. 129, 134–35 (S.D.N.Y. 1992).  Further, even when the "risk of prejudice is high . . . less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Zafiro*,

506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

### B. Discussion

Erskine and his co-defendants should be tried together.  There can be no dispute that all the defendants "are alleged to have participated in a common plan or scheme" based on their membership and association with Gorilla Stone, which creates a strong presumption in favor of joinder.  *Salameh*, 152 F.3d at 115.  In fact, Erskine is charged with participating in both a racketeering and a narcotics conspiracy with all of the remaining codefendants, and, except for Isaiah Santos, with possessing a firearm in furtherance of the narcotics conspiracy.  As a result, the charges against Erskine and his co-defendants clearly meet the requirements for joinder set forth in Rule 8 (nor does Erskine contend otherwise).

Meanwhile, Erskine's claims regarding the potential for prejudicial spillover are pure speculation, lack record support, and are wholly insufficient to satisfy the heavy severance burden. The Government currently anticipates no meaningful difference in the strength of the evidence against Erskine and his co-defendants; in fact, the evidence against Erskine may be comparatively stronger in light of the damning wiretap evidence of Erskine's intercepted calls wherein he discusses gang affairs, including acts of violence.  That is, the evidence against all of the defendants in this case is largely the same—testimony from multiple cooperating witnesses corroborated by, among other things, wiretap evidence, evidence from social media accounts, Apple iCloud accounts, cellphone extractions, narcotics seizures, and other witnesses.  The Government anticipates that roughly the same group of cooperating witnesses would likely testify, regardless of which defendants ultimately proceed to trial.  Moreover, of the remaining defendants, only Reid outranked Erskine in the gang's hierarchy and, as the wiretap evidence and witness testimony will show at trial, Erskine himself directed and participated in acts of violence in furtherance of the racketeering conspiracy.  On this record, Erskine has not demonstrated that this is a case where the "sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant" that it requires a severance.  *Spinelli*, 352 F.3d at 55.

In any event, the Second Circuit has explained that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *Id.* This is especially true in conspiracy cases, where much of the evidence would be introduced against all the defendants in the conspiracy even if they were tried separately. *See United States v. Diaz*, 176 F.3d 52, 103 (2d Cir. 1999). And any risk of prejudicial spillover can be cured with an appropriate instruction from the Court to consider the evidence against each defendant separately. *See, e.g.*, *Spinelli*, 352 F.3d at 55 & n.3 (noting that spillover prejudice may be remedied through clear judicial instructions); *United States v. Solomonyan*, 451 F. Supp. 2d 626, 650 (S.D.N.Y. 2006) (observing that "most courts," rather than sever, "employ limiting instructions to cure prejudicial spillover").

Further, all of the acts of violence committed by Erskine's co-defendants, including Soto's, Walker's, and Woods's violent crimes in aid of racketeering, would be admissible "as proof of the existence and nature of the narcotics [and racketeering] conspiracy[ies]." *Muyet*, 945 F. Supp. at 596-97 (collecting cases); *see also United States v. Rosa*, 11 F.3d 315, 341-42 (2d Cir. 1993) (rejecting severance argument where defendants were charged with participating only in narcotics conspiracy and not charged with acts of violence); *United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007) (noting "numerous prior rulings of this court in which criminal acts of non-defendants, including killings, were received to prove the existence of the criminal RICO enterprise in which the defendant participated"). As a result, Erskine has not established that he would be prejudiced in a joint trial simply because he is not charged with a specific violent crime in aid of racketeering. And, again, as the wiretap evidence and witness testimony will show at trial, Erskine himself directed and participated in acts of violence in furtherance of the racketeering conspiracy.

Finally, severing Erskine or Walker from their co-defendants and having two (or more) separate trials with nearly the same evidence and witnesses at each trial would needlessly strain judicial resources. As mentioned above, the Government anticipates that roughly the same lineup of cooperating witnesses would testify at any trial involving any of the defendants, and they would

be subject to similar lines of cross-examination. Additionally, the Government would need to present evidence of violent crimes in aid of racketeering at any trial involving any of the defendants. A joint trial ensures that all of this relevant evidence will only need to be presented once and will help ensure that all trial defendants receive consistent verdicts. As a result, Erskine has not even come close to satisfying the heavy burden required for a severance in this case.[11]

## V. **Miscellaneous Disclosure Deadlines**

Defendants seek an order that the Government provide Rule 404(b) evidence 60 days before trial and disclose all *Brady* and *Giglio* material immediately. (Dkt. No. 388 at 22-23 (Defendant Caswell Senior filing on behalf of co-defendants)). The Government agrees to provide Rule 404(b) evidence 60 days before trial, which it will do through an enterprise letter to counsel.[12] And the Government is aware of its disclosure obligations under *United States v. Brady* and will make disclosures consistent with such obligations, as already confirmed as part of the Court's Rule 5(f) Order.[13] However, defense counsel's request that the Government produce all impeachment material immediately, before a trial date has been set, is improper. In *United States v. Coppa*, the Second Circuit held that the district court could not order the production of all impeachment materials before trial, because it violated the Jencks Act, which provides that witnesses' prior

---

[11] If the Court believes Erskine's motion for a severance has any merit, the Government alternatively requests that the Court deny the motion without prejudice until closer to trial, when it will be clearer to the parties and the Court precisely how many defendants will stand trial. Plea negotiations remain ongoing, and so the Court will be better equipped to analyze any severance motion approximately sixty to ninety days before trial, which is currently unscheduled.

[12] An enterprise letter informs the defendants of the criminal incidents that the Government will seek to prove at trial, either as direct proof, as background, or as evidence admissible under Federal Rule of Evidence 404(b), including uncharged crimes and other bad acts committed by the defendants and fellow members in the charged racketeering conspiracy.

[13] Counsel claims that the Government is required to make inquiries for *Brady* or *Giglio* material from other states' prosecutors. However, the Government's disclosure obligations do not extend to these other state prosecutors or state law enforcement agencies as they are not members of the Government's prosecution team. *See United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (defining prosecution team to include those "who perform investigative duties or make strategic decisions about the prosecution of the case"); *United States v. Avenatti*, 2022 WL 394494, at *10-11 (S.D.N.Y. Feb. 9, 2022) (describing relevant factors in defining the prosecution team as applied to New York and California prosecutors).

statements are to be disclosed after the witness has testified on direct examination.  267 F.3d 132,

145 (2d Cir. 2001).  As is common practice, the Government intends to produce *Giglio* and Jencks

Act materials together before trial, on a schedule to be determined once a trial date is set.

**VI.**     **Conclusion**

 For the foregoing reasons, the Government agrees to provide Rule 404(b) evidence 60

days before trial and respectfully submits that the defendants' motions otherwise should be denied.

Dated:  White Plains, New York
        May 16, 2022

                                            Respectfully submitted,

                                            DAMIAN WILLIAMS
                                            United States Attorney

                          By:     _____/s/_____
                                            Shiva H. Logarajah
                                            David R. Felton
                                            Courtney Heavey
                                            Assistant United States Attorneys
                                            (914) 993-1918 / (212) 637-2299 / -2484